## BRADDOCK, by SMITH, v. PACIFIC WOODMEN LIFE ASS'N.

No. 5678. Decided February 17, 1936. (54 P. [2d] 1189.)

*Thatcher & Young,* of Ogden, for appellant.

*H. H. Henderson,* of Ogden, for respondent.

FOLLAND, Justice.

Plaintiff, by his guardian, sues as beneficiary of a certificate of fraternal benefit insurance issued on the life of his father, William B. Braddock. Defendant denied liability on the ground that certain statements made by the assured in his application for insurance, and claimed by it to be warranties, were untrue, thereby voiding the policy. On the trial the jury found for plaintiff, and the defendant appeals. Errors are assigned that: (1) The court applied the doctrine of misrepresentation rather than breach of warranty and thereby erroneously instructed the jury, and failed to give proper requests for instructions asked by defendant; (2) erroneously admitted evidence over defendant's objection; (3) denied to defendant the right to open and close the argument; and (4) misconduct of counsel for plaintiff in argument to the jury.

William B. Braddock, who was a member of defendant association, applied on August 10, 1933, for an additional beneficiary certificate in the sum of $3,000. The applica-

tion contained questions which applicant answered as follows:

"Have you within the past five years suffered any mental or bodily disease or infirmity? A. No.

"Q. Have you within the past five years consulted or been attended by a physician for any disease or injury or undergone any surgical operation? A. No.

"Q. Have you had in the last ten years any disease or injury other than those above mentioned? A. No.

"Q. Have you fully recovered from any and all the disease or conditions referred to above? A. Yes."

The beneficiary certificate was issued in reliance on the answers to the questions and without medical examination of the applicant by any physician. By the terms of the application the applicant consented and agreed that the application and all provisions of the constitution and by-laws of the association shall constitute a "basis for and form a part of any beneficiary certificate" that may be issued, and certified, agreed, and warranted that the answers in the application were true, and that any untrue answers or statements made in the application or any concealment of facts, intentional or otherwise, should render the certificate void. Pursuant to such application a beneficiary certificate was issued by the association and delivered to the applicant September 2, 1933. He thereupon signed his name on the face of the certificate to the following:

"I have read the above certificate and accept the same, and warrant that I am now in good health and have not been sick or injured since the date of my application. This the 2nd day of September, 1933."

The constitution and by-laws of the association provide that delivery of the certificate to the assured while in good health is a condition precedent to liability and that the certificate is issued in consideration of the representations, warranties, and agreements made by the applicant, and if any statement or declaration in the application be found in any respect untrue, the certificate shall be null and void.

On or about December 4, 1933, the assured became ill, was confined to his bed at home and later in a hospital. He died on February 6, 1934. The evidence shows that the assured was a strong man of about 36 years of age at the time of his death; that he had been employed by the Amalgamated Sugar Company and was accustomed to doing heavy work. During the two years immediately preceding his death he visited the office of the physician for the Amalgamated Sugar Company every month or six weeks and complained of hyperacidity of the stomach. He was given powders to relieve that condition. In February of 1933 he contracted the flu and remained home from work about a month or six weeks, during which period he visited the doctor and received some treatment. He visited the doctor the latter part of August, 1933, a few days before receiving his policy of insurance. He was examined and found to have a weakening of the heart muscles, or myocarditis. For this ailment digitalis was prescribed. He visited the physician again on November 2d and the same remedy was again prescribed for him. There is some evidence tending to show that a similar examination and prescription were given prior to the above dates, but no date was fixed and it is not clear whether the testimony refers to the visit the latter part of August or to some prior occasion. Medical experts testified that myocarditis is a disease and that the physical condition of the assured as disclosed by the evidence was such as might tend to impair his health and affect longevity.

In November of 1933 a chain fell on Braddock's foot "breaking a toe and lacerating it," notwithstanding which he continued at his work. Later in the month he fell over a plank and "complained that he hurt his hip." About December 4th he became so ill that he was confined to his bed. He was removed to a hospital two or three days before he died, February 6, 1934. The attending physician, in the death certificate, made the following entry:

"The principal cause of death and related causes of importance were as follows: Rheumatic heart; Duration 10 year; Embolism pul-

monary, Duration 1 day." In another document the physician used the term "Coronary Embolism" instead of "Embolism pulmonary."

Appellant contends there was a breach of warranty in that the assured was not in good health either when he made application or when he received the policy; that he had bodily disease and infirmities within five years preceding the making of his application; that he had consulted and been attended by physicians for disease and infirmity, and that his failure to so report in making answers to the questions in the application rendered the answers false and the policy void. The association tendered back the amount of the premiums paid, which tender was refused. The trial court submitted the case to the jury on the theory that the statements made by the assured in the application were representations rather than warranties. Contending, as it does, that the statements referred to were untrue and that there was a breach of warranty, the appellant insists the court should have directed a verdict for the defendant, and in any event that the instructions to the jury should have been on the theory of breach of warranty rather than misrepresentations.

A different and more strict rule of law applies to breach of warranty than to false representations. "A warranty in the law of insurance consists of a statement by insured upon the literal truth of which the validity of the contract depends." 32 C. J. 1273. The distinctions between warranties and representations are stated as follows in 32 C. J. 1275:

"* * * a warranty must as a rule be strictly true or fulfilled, while it is sufficient that a representation be substantially true; that the materiality in fact of matter made the subject of a warranty is not, unless the rule is altered by statute, important, while a representation, the falsity of which will avoid the policy, must, at least in the absence of bad faith, have been as to a material matter. Again, the good faith of insured is immaterial in the case of a warranty, while it is important in the case of a representation. Further, it has been pointed out that a misrepresentation renders a policy void upon the

ground of fraud, while the falsity or nonfulfillment of a warranty operates as a breach of the contract."

In this state we have a statute respecting statements made by the assured in application for life insurance to be issued by life insurance companies which provides: "A provision that the policy shall constitute the entire contract between the parties, and that, all state- ments made by the insured, shall, in the absence of fraud, be deemed representations and not warranties." R. S. Utah 1933, 43-3-24, subd. 4. This section is not appli- cable to the business of fraternal benefit societies. R. S. 1933, 43-9-4 and 43-1-1.

The decision of this court in *Chadwick* v. *Beneficial Life Ins. Co.*, 54 Utah 443, 181 P. 448, is not controlling here for the reason that in that case the policy of insurance was one written by a life insurance company subject to the statutory provision above quoted. It was there held, pursuant to the statute, that statements made in an application for such insurance were representations and not warranties. In the absence of statute it is generally held that parties have the right to make an agreement to the effect that statements made by the assured in his applica- tion shall be warranties, and that any untrue statement or answer, or concealment of facts, intentional or otherwise, shall make the beneficiary certificate void.

The parties here having made such an agreement, they will be held to be bound by it. *Sargent* v. *Modern Brother- hood of America,* 148 Iowa, 600, 127 N. W. 52, 55; *Jaklevic* v. *Supreme Lodge of Fraternal Brotherhood,* 131 Kan. 203, 289 P. 467. The contract provisions, however, were made in contemplation of the law existing in this state, and are subject to the interpretation to be given the language of such statements announced in the cases of *Bednarek* v. *Brotherhood of American Yeomen,* 48 Utah 67, 157 P. 884, 887; *Witherow* v. *Mystic Toilers,* 49 Utah 177, 161 P. 1126, 1127. The insurance contract in the Bednarek Case was

one issued by a fraternal benefit society. The applicant answered "No" to the questions regarding illness, ailment, or injury, and consultation with physicians, which representations were claimed to be untrue. The court recognized the statements as warranties, but held to the rule of liberal construction as follows:

"They may, by the terms of the contract, provide that a misrepresentation may be made a warranty and render the contract void. And there is a long list of authorities which hold that false statements which are made warranties will nullify the contract, regardless of whether the misstatements have a bearing on the question of risk, or whether the death of the insured did or did not result wholly or in part from the matters about which the false statements were made. We think the better reasoned decisions in this class of cases, and those more in accord with our ideas of justice, are to the effect that where the false statements relate to mere temporary ailments, or to a slight indisposition that in no way tended to impair or in any way prejudicially influence the health or longevity of the insured, such statements will not render the policy or certificate void. In the case of *Peterson* v. *Des Moines Life Ass'n*, 115 Iowa, 668, 87 N. W. 397, it is said:

" 'The tendency of the courts, without the aid of legislation, has been to construe statements as to previous accidents and diseases into mere assertions on the part of the applicant as to what he knows of his personal knowledge, or may be presumed in good faith to know, instead of strict warranties regardless of personal knowledge. *Wilkinson* v. *Connecticut Mut. Life Ins. Co.*, 30 Iowa, 119, 6 Am. Rep. 657. It is well settled that such *warranties are to be construed with reference to the general object of the inquiry.*' (Italics ours.)"

Many cases are there cited in support of the rule announced. The same doctrine was followed in the *Witherow Case*, supra. There the defendant sought to have the court apply the strict rule of warranty to statements made by the assured in his application, contending that such statements were untrue and even though not material to the risk that such breach nevertheless voided the contract. The court refused to apply the literal rule and said:

"Because of this evidence it is contended that the defendant, on the issue of the breach of warranty, was entitled to a directed verdict

in its favor. It is not claimed that the injuries affected the deceased's general health, or that they contributed to the cause of his death, 'congestion of the lungs.' It, however, is claimed that the statements that he had received no injury and had not been attended by a physician constituted a breach of warranty, though such facts or statements were not material to the risk, and that such breach, though not causing the loss, nevertheless avoided the contract. Cases and authorities cited by appellant so hold. 3 Joyce, Ins. §§ 1970-1975; 3 Cooley, Briefs on Insurance, 1950-1952; *Nelson* v. *Nederland Life Ins. Co.*, 110 Iowa, 600, 81 N. W. 807; *Cobb* v. *Covenant Mut. Ben. Ass'n*, 153 Mass. 176, 26 N. E. 230, 10 L. R. A. 666, 25 Am. St. Rep. 619. But in a recent case we held otherwise. *Bednarek* v. *Brotherhood of American Yeomen*, 48 Utah 67, 157 P. 884. Adhering to this decision, we are not prepared to say that the deceased's failure to state that he, seven months prior to obtaining the certificate, was visited by a physician for a sprained knee, or his failure to state such injury, or the other injuries, was, as matter of law, of such materiality as to avoid the contract, or that such injuries or withholding knowledge of them substantially increased the chances of loss insured against."

The doctrine announced in these cases we believe to be sound and should be applied in this case.

The instructions of the court were drawn on the theory that all statements made by the assured were representations and not warranties. Indeed, the word "representation" is used throughout. The defendant was held to the requirement of proving that the assured knew or should have known he was suffering from a disease or infirmity more than a mere temporary ailment, that the assured was under the duty to make the disclosures called for, and that the representations, if falsely made, were material to the risk. All of these qualifications inhere in the case of representations, but do not all apply as to warranties. The jury should have been instructed that the statements were warranties and that it was a question of proving the existence of the facts relied on, if material to the risk. 14 R. C. L. 1070; *Pickens* v. *Security Benefit Ass'n*, 117 Kan. 475, 231 P. 1016, 40 A. L. R. 654; *Knights of Maccabees of the World* v. *Shields*, 156 Ky. 270, 160 S.

W. 1043, 49 L. R. A. (N. S.) 853; *Fraternal Aid Union* v. *Miller,* 106 Okl. 277, 234 P. 357. In other words, if the jury should find from a preponderance of the evidence that the assured was not in good health at the time he made application, and that such condition was material to the risk, the policy would be void irrespective of whether he knew such condition or sensed the gravity of any ailment he then had. That is to say, the answer "Yes" to the question, "Are you in good health?" in the application was a warranty of good health and its effect on the validity of the policy did not depend on the knowledge or good faith of the applicant. It was, however, a question for the jury to determine from all the evidence whether the applicant was in fact in good health at the time. The burden of proof was, as the court rightly instructed, on the defendant to prove by a preponderance of the evidence that the assured was not in good health at that time. The same rules apply to the receipt of the policy when the assured accepted it and warranted "that I am now in good health and have not been sick or injured since the date of my application." *Continental Illinois Nat. Bank & Trust Co.* v. *Columbian Nat. Life Ins. Co.* (C. C. A.) 76 F. (2d) 733.

It will be enlightening to consider the questions propounded to the assured and which he answered in his application. The first one is, "Have you within the past five years suffered any mental or bodily disease or infirmity?" The question does not call for a disclosure of any or all temporary or trivial ailments, but only of diseases or infirmities. Mere temporary ailments or indispositions not of a serious or dangerous character which leave no trace on the constitution or affect the soundness of the system are not regarded as diseases. *Penn Mut. Life Ins. Co.* v. *Mechanics' Sav. Bank & Trust Co.,* 72 F. 413, 19 C. C. A. 286, 37 U. S. App. 692, 38 L. R. A. 33, rehearing denied 73 F. 653, 19 C. C. A. 316, 43 U. S. App. 75, 38 L. R. A. 70; *Metropolitan Life Ins. Co.* v. *Brubaker,* 78 Kan. 146, 96 P. 62, 18 L. R. A. (N. S.) 362, 130 Am. St. Rep. 356,

16 Ann. Cas. 267; *The Homesteaders* v. *Stapp* (Tex. Civ. App.) 205 S. W. 743. So, likewise, the words "bodily infirmity" are restricted to anything that materially impairs, weakens, or undermines the constitution of the assured, tends to reduce his powers of resistance and thereby enhances the risk of death. *Eastern Dist. Piece Dye Works* v. *Travelers' Ins. Co.,* 234 N. Y. 441, 138 N. E. 401, 26 A. L. R. 1505, and *Druhl* v. *Equitable Life Assur. Soc.,* 56 N. D. 517, 218 N. W. 220, 60 A. L. R. 962. In an absolute sense no person is entirely free from infirmity. The words, however, will not be construed as covering a condition of insignificant extent and having no practical effect on the bodily condition of the applicant. In the *Bednarek Case,* supra, the questions had a wider scope, but by the decision of the court were restricted in their meaning to substantially the questions asked in this case.

In cases involving a fraternal benefit certificate the insuring association may select the terms on which it will carry the insurance, and may insist that the contract is void if such terms are not complied with. That is the holding in the case of *Sargent* v. *Modern Brotherhood of America,* supra, a case quoted and relied upon in the Bednarek decision by this court, supra, which case further holds:

"But in the interpretation of the language used in calling for answers and in making response to such inquiries, the courts insist upon a reasonable or even a liberal construction in favor of the assured, with a view to avoiding forfeitures on purely technical grounds. * * *

"Thus, it has been held that a statement that the applicant is in good health is not shown to be false by proof of a temporary ailment, not indicating a vice in the constitution or so serious as to have some bearing on the general health and continuance of health; that is, such as according to common understanding, would be called a disease."

The question propounded to applicant with respect to consultation with a physician is limited to consultation or attention by "a physician for disease or injury." Given its fair

interpretation, this does not require a disclosure of every consultation as to indisposition not amounting to a disease. There is in this case no question with regard to any injury. The question is worded in accordance with the liberal rule of construction applicable where even a more general question is asked. See annotation and cases, 63 A. L. R. 846; 45 C. J. 85.

The question, "Are you now in good health?" is subject to a similar interpretation. As already indicated, the question for determination is not whether the applicant knew he was or was not in good health, or whether he answered in good faith. The warranty is that he is in fact in good health at the time. The meaning of the term "good health" is well stated in *Klein* v. *Farmers' & Bankers' Life Ins. Co.,* 132 Kan. 748, 297 P. 730, 732:

"What is good health as used in the insurance contract like the one in question? It is not apparent good health, nor yet a belief of the applicant that he is in good health, but it is that he is in actual good health. Of course, slight troubles or temporary indisposition which will not usually result in serious consequences, and which do not seriously impair or weaken his constitution, do not establish the absence of good health, but, if the illness is of a serious nature, such as to weaken and impair the constitution and shorten life, the applicant cannot be held to be in good health. *Miller* v. *Knights and Ladies of Security,* 103 Kan. 579, 175 P. 397; *Pickens* v. *Security Benefit Ass'n,* 117 Kan. 475, 231 P. 1016, 40 A. L. R. 654. In a note in 40 A. L. R. 663, it is said: 'The general rule appears to be that the term "good health" when used in a policy of life insurance means that the applicant has no grave, important, or serious disease, and is free from any ailment that seriously affects the general soundness or healthfulness of the system. A mere temporary indisposition which does not tend to weaken or undermine the constitution, at the date of the policy, does not render the policy void. And it seems that an apparent condition of good health or anyone's belief that the insured is in good health is not sufficient."

It follows, therefore, that it was for the jury to find from all the evidence whether or not the applicant was in good health, as that term is herein construed, at the time he made the warranties to that effect.

Defendant's requested instructions Nos. 2 and 3 contain a substantially correct statement of the law and are in harmony with the rulings of this court in the Bednarek and Witherow Cases and what we have outlined above. These instructions, if given, should be supplemented ■ by definitions of the words "disease," "infirmity," and "good health," as herein indicated, so that the jury would know the true meaning of those terms.

We have discussed the instructions of the court and the theory on which the case was tried by it on the assumption that there was a conflict in the evidence on the issues of fact as to the state of health of the assured and as to the nature and gravity of the indispositions or weaknesses for which he consulted physicians. After a careful reading of the evidence, we are of the view that while there is ample evidence in the record to support a verdict for the defendant, if one had been rendered, yet that evidence was not unchallenged by the plaintiff. We think there was such conflict in the evidence that the court should have submitted the case to the jury, but on the theory of warranty rather than of representation.

In view that a new trial must be ordered, we shall discuss other assigned errors. Objection was made to a hypothetical question put to a medical expert called by plaintiff. The question is as follows:

"Q. Doctor, take a man who had appeared to be strong and healthy during the months or for many years, and in the month of November, the latter part of the month of November, 1933 he has a chain or some heavy substance fall on his foot and injures one of his toes and mashes it and produces bleeding, and a week or ten days after he falls and hurts his hip, and, on about the 4th day of December he is taken home and from that time he is confined to his bed, and he is very sick, and he has what the doctors call rheumatism and rheumatic heart, what in your opinion would you say was the cause of that?

"Mr. Young (counsel for defendant): I object, incompetent, irrelevant and immaterial.

"The Court: Objection overruled.

"Q. You are taking it for granted he was in good health working along from day to day?

"A. Yes.

"Mr. Young: I make the further objection now, that that assumption by the Doctor is contrary to the evidence.

"The Court: Objection overruled.

"A. I would say the cause under those circumstances would be his trauma.

"Q. Let me finish the question, and that man died suddenly on February 6th following and it has been denominated by the attending physician as embolism coronary and embolism pulmonary, it would not be both, would it?

"Mr. Young: Pardon me, I make the further objection the hypothetical question does not include all the evidence and is contrary to the evidence.

"The Court: Objection overruled.

"A. In my opinion, a man suffering some kind of injury which he said there was a blow about the toes, something which impaired his locomotion, which, perhaps, caused him to fall down and injure his hip or fracture his hip, following that.

"Mr. Young: May I interrupt the Doctor to make a further objection, that the Doctor is now giving an opinion about facts he is assuming himself, and not upon the evidence given to him by the hypothetical question, it is very apparent.

"Mr. Henderson (counsel for plaintiff): Why, he is repeating word for word what I said.

"A. Going right in where he started with his question.

"The Court: I will permit him to answer."

The objection should have been sustained. *New York Life Ins. Co.* v. *Doerksen* (C. C. A.) 75 F. (2d) 96. Relevant matters in evidence respecting the deceased's visits to doctors, an attack of the flu, his hyperacidity of the stomach, his myocardiac condition, and the prescribing of digitalis for it, were entirely omitted from the question, while the witness was asked to assume the applicant was in good health, the very matter in controversy, prior to his final illness. The doctor was also permitted to assume there was infection in the toe injury, and that the assured suffered a fractured hip of which there was no evidence. The only evidence with respect to these injuries was that of Mrs.

Braddock that a chain fell on Braddock's toe and mashed or broke it, notwithstanding which he kept on working, and later fell over a plank and complained he had injured his hip. No witness testified as to the nature or extent of these injuries, nor were they referred to in the certificate of death. The issue before the court was not the cause of death but the condition of the deceased's health at the time he made the warranties as to health prior to his final illness. While it is permissible that a hypothetical question be predicated on a statement of facts detailed by witnesses for one of the parties (11 R. C. L. 580), the question here omitted undisputed facts and included others not supported by evidence. Obviously, the question was improper and misleading.

The wife and brother-in-law of deceased were permitted to answer that during their acquaintance with him extending over a period of 15 or 16 years he was not troubled with rheumatism. The objection was that the witnesses were not qualified; that the question called for a medical opinion from lay witnesses. The rule is stated as follows in the annotation in 93 A. L. R. 482:

"It is settled by the great weight of authority that while a lay or nonexpert witness may testify as to the apparent physical condition of another which is open to ordinary observation by a person of common experience, as, for example, his general health, strength, vigor, or feebleness, illness, etc. (11 R. C. L. p. 606; 5 Enc. Ev. pp. 697, 698; 1 Wigmore, Ev. Sec. 565), he may not testify as to the existence, or nature or character, of latent conditions, such as the existence of a particular disease which is discoverable, or its nature or character which is determinable, only through the peculiar experience, knowledge, and training of an expert, because such testimony violates the rules requiring a witness to be competent to testify as to the subject in question and excluding opinion evidence by nonexperts."

*Inter-Southern Life Ins. Co.* v. *Stephenson,* 246 Ky. 694, 56 S. W. (2d) 332; *Van House* v. *Canadian Northern Ry. Co.,* 155 Minn. 57, 192 N. W. 493, 28 A. L. R. 357.

No effort was made to qualify the witnesses as to their experience with or ability to determine a rheumatic condition, nor to limit their answers to well-known or recognized symptoms about which a lay witness might well answer. Each witness had an intimate acquaintance with the deceased extending over a period of years. The questions, however, did not call for a specific diagnosis of the disease. The witnesses were asked, "Was he troubled with rheumatism?" This might be understood to mean, did he make complaint or did he show any of the well-recognized symptoms of that disease. The question should have been more carefully worded so as to call for conditions observed, or not observed, by the witnesses about which they would be competent to answer.

The right to open and close the argument to the jury was demanded by the defendant but denied by the court. The reason urged in support of this claim was that the defendant had the burden of proof on all of the issues presented to the jury. The only evidence introduced by plaintiff was the benefit certificate, the execution and existence of which had been admitted by the defendant. The defendant had the burden of proof as to the allegations made by it and on which it depended to defeat the validity of the policy. It is a general rule, in the absence of statute, that a party holding the affirmative of the issues has the right to open and close the argument. 26 R. C. L. 1023. We have a statute which provides:

"When the jury has been sworn the trial must proceed in the following order, unless the judge for special reasons otherwise directs: * * *

"(5) When the court has instructed the jury, unless the case is submitted to the jury on either side, or on both sides, without argument, the plaintiff must commence and may conclude the argument." Rev. St. 1933, 104-24-14 (5).

In *Ogden Valley Trout & Resort Co.* v. *Lewis,* 41 Utah 183, 125 P. 687, 689, this court held under similar circumstances that where the court allowed the defendant to open

and close the argument, that it "did no more than to follow the law." No reference was made in that decision to the above statute which was then the law as it' is now. The meaning of the statute is quite clear, that, unless for special reasons the trial court in its discretion otherwise directs, the plaintiff is entitled to open and close the argument to the jury. The fact that a defendant holds the affirmative of the issues is a sufficient "special reason" for the trial court to vary the statutory rule. It would have been entirely proper and in accordance with justice for the trial court to have permitted the defendant to open and close the argument in this case. The matter being within discretion, it was not error for the court to refuse defendant's request.

Certain remarks made by counsel for plaintiff in his argument to the jury are assigned as improper and prejudicial. These remarks, while not justified by the record, are not of inflammatory character. The court, we think, adequately took care of the matter in his instructions to the jury. After the colloquy between counsel respecting the objectionable remarks, the court again cautioned the jury against being influenced by "feeling or argument engendered in controversy as between counsel such being no evidence in the case."

The judgment of the trial court is set aside and the cause remanded to the district court of Weber county for a new trial. Costs to appellant.

ELIAS HANSEN, C. J., and EPHRAIM HANSON, MOFFAT, and WOLFE, JJ., concur.